By the Court,
G-rimkb, Judge.
The ground which the complainants assume, in order to entitle them to a perpetual injunction, is, that the work prosecuted by the respondents, will be a permanent obstruction to the navigation of the Cuyahoga, and inasmuch as their property,, and the business in which they are embarked, are dependent for their value upon the free navigation of .the river, that the work undertaken by the repondents will draw after it an irreparable injury to them.
Will, then, the contemplated bridge obstruct the navigation of the-river ? Will it, if permitted, be a violation of the ordinance ? And *55 will it be productive of irreparable mischief to the complainants ? For the first question the state may be considered a party; in the second, the government df the union is directly interested; and the third has relation more immediately td the respective rights of th« complainants and respondents. And yet the determination of the first two, may, in reality, decide the last, for inasmuch as private individuals may maintain a suit for an injury occasioned to them by a public nuisance, yet the moment that the question of nuisance or no nuisance is determined in one way, an end will be put to the question of private right also.
Whether the erection of a bridge will impede the navigation of the driver over which it is thrown, must necessarily depend upon eircumstances. It will, in some measure, depend upon the nature of the bridge which is to be erected, the particular situation where it is placed, and the kind of vessels which navigate the river. When a communication is thus established between the opposite banks of a stream, it is for the purpose of facilitating the travel and transportation upon the highway which leads to it: and if this highway should, as in the present instance, be one continued street, connecting two densely peopled towns, and binding them together as OBe community, it would not be right for the mind to fasten its attention exclusively upon one of these objects, or to consider the one as merely subordinate to the other. Such a ease presents, at any rate, a eonflict of interests, if not of rights, and it should be our endeavor, if possible, so to reconcile them, that the one shall not encroach upon the other. Ono reason, perhaps, why the navigation of the river is considered the. primary, and the freedom of the highway as the secondary interest, is, that rivers are found traced upon the map of the country on its firs'! settlement, while the road or the street is an artificial work, undertaken and abandoned, as the exigencies of society may require. It is a reason calculated to impose upon the imagination, for the latter may acquire as great if not a greater importance than the first..
It appears that the legislature of this state, in 1817, passed an act declaring the Cuyahoga River navigable, and at the same time prohibited, under severe penalties, all obstructions to the navigation of it. It is sometimes difficult to determine what is the precise character of a stream. Rivers were once divided into navigable and not navigable. They are now generally divided into three classes, the two former, and a third partaking of the character of each of the others, and yet distinguishable from both. The act of 1817, however, must *56 be considered as affording unequivocal evidence of what was the intention of the legislature with regard to this stream. There is no gainsaying its provisions, so long as they stand uneontradieted by the same authority which declared them. And this renders it very important to examine several other statutes, for the purpose of ascertaining the true construction which should be given to the act of 1817, or for the purpose of answering a still further inquiry, whether that act has not, by necessary implication, been repealed, so far as regards the subject matter of this suit? The fact that the legislature, when they have declared a river navigable, have generally specified mill dams as an obstruction, can not be considered as evidence of an intention to except every other mode of impeding *the navigation. Nor is the fact that they have authorized the erection of dams and aqueducts in the construction of the great public works of the state, conclusive as to what individuals.may do : though this may be a circumstance of some importance hereafter, in giving an interpretation to the ordinance, and determining the right of the general government.
It is shown that a road or highway has been laid out, leading from Brooklyn Township to ClevelandTownship, crossing the river at this place; and it also appears, that in 1820, the legislature passed an act authorizing Noble II. Merwin and Josiah Barber to build abridge across the river, within limits, whieh include the point where the defendants are erecting their work. They did not avail themselves of the benefit of this act, and a temporary free bridge was afterwards built at the same place. In 1828, another act was passed authorizing a company to erect a toll bridge across the river at some place between Vineyard Lane and the entrance of the Ohio canal. These acts contribute very strongly to show that the legislature do not consider the erection of a bridge, as per se an obstruction to a river : they go further, they show that they did not consider it an obstruction at this particular point. If this reasoning could by possibility, be deemed not to be legitimate, then these various acts must at any rate, be regarded as a repeal, so far as regards the subject matter of this suit, of the statute of 1817. At a still later period, in 1832, an act was passed authorizing the erection of a bride higher up, across the river, and in that act is contained this proviso, “ that nothing herein contained shall be so construed as to prevent the repairing, keeping up and using the floating bridge which is now in use, nor to prevent the building another in its stead.” The company which had been created *57 in 1828, relinquished their right to the public in 1829; a floating ■bridge was then built by subscription, and maintained by the county commissioners, from whom these defendants, in 1836, obtained permission to build a drawbridge. Taking all these circumstances together, if they do not amount to a positive declaration on the part of the legislature, not only that a bridge, but that this bridge, would be a lawful erection, and if they do not, prima facie, show the acquisition of a right on the part of the defendants to build, I do not know what will have this effect.
But inasmuch as the complainants purchased property on the river -in the expectation that the navigation would not be obstructed, it may "be necessary to examine the testimony still further, in order to see whether the whole result of it will at all vary the conclusions to *whieh we have been hitherto justified incoming? Here, however, very little satisfaction is to be gained. There is an irreconcilable conflict in the testimony which has been taken. The witnesses on the part of the complainants are generally of opinion that the proposed work would be an injury to the navigation, while those who testify for the respondents are almost equally unanimous in a contrary belief. Eor instance, John Haggerty says that a wind blowing from the lake, and which will enable a vessel to enter the harbor, will carry it half a mile above the bridge, and he is sustained in this by three other witnesses, while on the other hand they are all directly contra-■dieted by several witnesses whom the respondents have examined. So on the question whether there will be sufficient room below the bridge to transact all the shipping business, there is the same diversity. John Sims and- several others think there will be, and give as one reason, that the Cuyahoga River below the bridge is larger than the harbor at Buffalo. In like manner the witnesses on the part of the com plainants, believe that the warehouses and other property owned by them, will be much diminished in value, while on the other hand those •on the part of the respondents are equally confident that that property would be rendered even more valuable than it is, if the proposed bridge were built. Some of the witnesses not only testify that the bridge would not be an obstruction, but that it would even assist the navigation of the river, since it would afford a place for vessels to make fast their warping line to. It is vain and needless to trace the difference of opinion which runs through nearly all the testimony : but it is easy to see that it presents a complete obstacle to the extraordinary relief which is sought in these bills.
*58 There is no circumstance in the administration of justice, which is-more striking than the contradiction which is discovered, not occasionally, but constantly, in the testimony of witnesses. Every belief which witnesses have concerning even what are called matters of fact, is necessarily made up of á judgment as well as of a direct perception. So far as the last is concerned, every one may be impressed alike ; but there is no testimony, however plain and simple it may be,, which does not require a great variety of judgments to be formed, in order to render it at all intelligible to the, person delivering it in the first instance, and to those to whom he communicates it afterwards. The mind is so accustomed in the common affairs of life, to form these judgments with instantaneous rapidity, and they are at the same time so numerous, and so minute, that they entirely escape our observation ; and we suppose that we are only seeing an ^object, when-in addition to that, and in order to see it, we are really forming a great multitude of judgments ! And as our judgments depend upon our faculties, which are so various, and so variously used, the extreme contradiction which is met with in the testimony of witnesses is not an unaccountable fact at any rate. There is no part of the testimony in. these cases which does not afford illustration of these remarks. Witnesses are examined as to a fact of some importance, whether there is any shipping business of importance transacted above the bridge ; for if there is not, the bridge would not be an obstruction. Some of them testify that business of that character is transacted above the bridge, while others testify that • it is the rarest thing imaginable for vessels to move up above that point; that if they do, they are warped up, and never sail up, and it is only for the purpose of being over-hauled or repaired, or for the purpose of laying up during the winter. With regard to the bridge, some of the witnesses think that the draw which is proposed to be constructed, will obviate all difficulty as to the-passage of vessels, and others are of a directly contrary belief. It is evident what a multitude of judgments and reasonings are involved in the simple examination with regard to this one matter, and what room-there may be for the greatest variety of opinion.
There is another circumstance equally entitled to observation with the one I have just noticed — it is that, when testimony the most discordant imaginable, and tending to totally different results, has been delivered, has had its effect, and a judgment, as must necessarily be the case, has been pronounced upon one side or the other, all the difficulties which had been anticipated in practice, begin to disappear. *59 Things are seen in a different light from what they were before, which, alone occasioned snch a difference of judgment; and the parties frequently find that their interests, which were believed to be absolutely contradictory, are not only reconcilable, but acquire strength from their alliance. The circumstance which, occasioned a difference of opinion and a supposed conflict of rights, disappears. Minds which before saw things- differently, now see them alike.
But the complainants have relied upon the ordinance of Congress of 1787. The various acts of the state legislature which have been referred to, as giving a construction to the term navigable river, or as limiting its meaning in practice, are not here of the same importance-as under the first branch of the case. The right now to be considered, is one which affects the authority of the general government, as well as that of the state ; and it would not be safe to rely upon a sumptive evidence of intention, contained in a number of local acts, as furnishing an absolute rule of interpretation. And yet when it is-considered, that the lawfulness of those acts has never been questioned by the federal authority; that since the foundation of the-state, its legislature have authorized bridges to be erected over the largest streams, the argument drawn from acquiescence is not without force: and when it is also remembered, that Congress have given, donations to the state to aid in the construction of its canals, after it was known that in the prosecution- of the work, some of the widest, streams were crossed by draws and aqueducts, the argument from acquiescence is still further fortified.
The ordinance consists of two parts ; first, of a constitution of government for the then territory ; and secondly, of articles of compact? which were intended to look beyond the period when the people-should emerge from their territorial condition, and become members-of the union. I have called this part a compact, because it is so termed in the instrument: but if it were not for some things which have since taken place, there might be great difficulty in regarding it. in that light. There was in reality but one party to it originally, and that was the general government. But when application for admission into the union was made by the people inhabiting the eastern part of' the territory, modifications in several parts of the ordinance were asked for, and they were granted by the United States as one party, to the state, as the other. This seems to show, that the people of' Ohio have, so far, treated the articles of compact as of perpetual obligation. The alterations proposed were with a view to the imme *60 •diate formation of a state constitution, and were of no importance, if the state should have a right to annul the ordinance the moment it ■assumed that condition. The state may thus, by its own act, have converted that into a compact which was before only a fundamental act of Congress.
But what is the true meaning of that clause which declares the free navigation of our rivers. Its language is this: “The navigable
waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said territory, as to the citizens ■ of the United States, and those of any other states that may be admitted into the confederacy, without any tax, impost, or duty therefor.”
When the ordinance was framed, the articles of confederation were in force. This instrument provided for the admission of Canada into *the Union, but it was entirely silent with regard to the formation of any other new state. It gave no power to organize new states within the bounds of the confederacy. The consequence is, that any new communities which may have sprung up, by whatever name they may have been called, would have been mere dependencies on, and not integral parts of the confederacy. The act of cession by Virginia, ■six years later in date, for the first time provided for the creation of new states, having all the powers of the original states. But for it, the legislature of the Union may have exercised an unlimited control over those communities. The articles of confederation afforded them no security. Congress may have passed laws affecting the navigation of their rivers, and have imposed duties on the commodities transported on them. And the inference which I think we are now justified in making is, that the clause in question, so far as it regards the people of the territory, is a guarantee to them against the interference of Congress ; that it is, in other words, a limitation on the power of the general government, and not a prohibition to the new states. For the clause in question consists of two parts, which are very distinct from each other, not merely because the language is different, but because the subject matter in each is of a different'character. The first assures a free navigation to the people of the territory, and the second to the people of the other states. It is impossible to admit that the first imposes a restraint upon the legislation of the new states, without doing violence to the act of cession, and to the ordinance itself both of which declare that those states should be admitted to a share *61 in the federal eonneils on an equal footing with the original states. It • is plain that the construction contended for, would involve a manifest inconsistency between different parts of the ordinance, and would permit a direct encroachment on the acknowledged powers of those new states.
If this part of the clause is too vague to admit of this construction, then the only other interpretation which we are permitted to give it,, is, that it forbids the states to be formed out of the territory from regulating their internal commerce, or from imposing discriminating duties on persons who should be citizens of one or more of those states, and not citizens of the state passing such laws. The words- “ states afterwards admitted into the confederacy,” which occur in the ■ latter part of the clause, was not sufficient to denote this intention, inasmuch, as there might be, and actually have been, several new states-created, which were not included in the north western territory.
*But if I should be mistaken in endeavoring to give a just and sensible interpretation to this part of the clause — if it does undertake to prohibit the northwestern states from passing laws affecting the navigation of their rivers, then it might become a question whether such a provision was not, ipso facto, abrogated by the constitution of' the United States ; for the people of a state have not even the right to cede to the government of the Union any of those powers which appertain to its domestic jurisdiction, and which go to make up the idea-of a distinct state. It would not only subvert the authority of the - state, but would also disturb the necessary balance between the federal- and local governments. It will be observed, that the section immediately preceding the “ articles of compact,” declares, that they are ■ adopted, among other things, to ensure the admission of the new states • to a share in the federal councils on an equal footing with the original - states : and the last article but one of the compact, provides that they shall be admitted on an equal footing with the original states in all-respects whatever. To suppose that the author of that instrument intended to spoil the work of his own hands, by mutilating the just authority of the state governments, would be, to say the least, unreasonable, and I have therefore preferred to put such an interpretation upon it, as is at once natural and consistent. The remaining part of ’ the clause, which relates to the citizens of the United States and to those of other states does contain a prohibition on the states of the territory ; and its true sense and intention may be gathered from the-history of the country prior to that time. At a yery early period,. *62 ■even during our colonial condition, the citizens of different parts of the country were greatly harassed by the interfering regulations of the local governments. A difficult controversy once existed on this subject, between Connecticut and Massashusetts. The former state commanded the mouth of the Connecticut river, and imposed duties on boats from Massachusetts. And Massachusetts, in retaliation, laid an impost on all commodities exported to or from Connecticut. The New England confederacy, as it was termed, was in existence at that time, but it was not armed with sufficient authority to prevent these collisions. There was no period prior to the adoption of the articles of ■confederation, which did not attest the same spirit of hostile legislation among the colonies. Their alienation from each other was so extreme, that Dr. Franklin at one time doubted whether they would ever 'be able to form anything like a permanent union. The articles of confederation, for the first time, established that salutary regulation regarding the intercourse of the ^different states, which declared that “ the free inhabitants of each state should be entitled to all the privileges and Immunities of citizens in the several states. He who framed the ordinance, was familiar with the difficulties which gave rise to the insertion of this provision, and he determined to carry its whole spirit into the ordinance.
It was uncertain where the boundaries of the new states would be, •but it was very probable, that some of the rivers of the territory, would traverse more than one of them. It was the intention of the ordinance, first, to restrain a state from obstructing the navigation of .a river to the injury of the inhabitants of another state, into or from which it passed and in the second place, to prohibit all discriminating duties on citizens of other states, on any river, whether it run through several states, or was contained in the limits of the single state which attempted to impose such duties. This was effecting precisely what was effected by the constitution of the United States, which was in agitation at that very time, and was adopted two years afterwards. That gives to the citizens of each state, all the privileges and immunities of citizens of the several states, and in addition, ■clothes Congress with the power of regulating the commerce among the states. The principles of the new constitution, (as it was uncertain whether it would, be adopted,) were carried into the ordinance. But to suppose that it was intended to restrain the state from passing laws affecting the navigation of rivers, which lay exclusively within fits own limits, by authorizing the building of bridges, dams, or aque *63 ducts, can not be admitted, because it would, to say the least, be a palpable departure from those principles. That a state should wantonly clog the navigation of its streams, to the permanent injury of its own people, is not to be supposed. It is one of those events which no legislator would think of providing against, any more than he would against suicide. Or, if such a thing may be supposed, then it is clear, that the restraint can not be imposed in this instance, without invading the appropriate sphere of state jurisdiction.
He who framed the ordinance, had a difficult and delicate task to perform. The people of the United States were then living under the articles of confederation. What should be the exact limits between state and federal authority, what the relative powers of the two species of government, were questions deeply and extensively agitated, and therefore not yet settled. And still more undetermined was the question what should be the relative attributes and authority of states *whose existence was not provided for even in the articles of con federation.
This will account for the very singular fact, that not only does the ordinance establish a constitution for the territory, but some of the leading features of a constitution in embryo are marked out for the •new states, when they should be admitted into the Union. An attempt of this kind would never have been thought of, if the. constitution of the United States had then been adopted. Fortunately these outlines were conformable to the great principles of freedom, were copied from the constitution of other states, and were precisely the elements of government which the people desired to establish: otherwise, I do not know what would have become of them, when the states were admitted into the union under the constitution.
The conclusion to which I have come is, that the clause in the ordinances contains a limitation on the power of the general government, as well as a prohibition to the states. Or- if it is not divisible into two distinct parts, that then it contains throughout a prohibition to the states ; that this prohibition restrains these states from passing laws which should have the effect of regulating its commerce with other states, or from imposing discriminating duties on the citizens of other states, but does not prevent them from legislating concerning rivers which run exclusively within their own limits, when their own ■citizens, equally with the citizens of other states, are subjected to any inconvenience or disability which may flow from that legislation.
There is, in reality, no remaining question to be examined. For al *64 though I have considered the case as leading to a third division, yet if' the question of private injury to the property of the complainants, is itself dependent upon the fact, whether the navigation of the river will be obstructed, and there is not evidence under either of the first two branches that it will be, every ground upon which the complainants ask for relief is taken away.
Bills dismissed ; but on the application of the complainants, an appeal was allowed to the Supreme Court of the United States.
Wood, J. being related to a party in one of these suits, did not sit. during the trial of either.